IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2000 Session

## STATE OF TENNESSEE v. G'DONGALAY PARLO BERRY and CHRISTOPHER DAVIS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-D-2728     J. Randall Wyatt, Jr., Judge**

---

**No. M1999-00824-CCA-R3-CD - Filed October 19, 2001**

---

A jury convicted the defendants of first degree murder in the shooting death of Adrian Dickerson. For this offense, the defendants received life sentences. They now appeal their convictions bringing three issues each. More specifically, G'dongalay Berry contends (1) that the trial court erred by not granting his request for a severance while allowing testimony concerning Berry's co-defendant's solicitation of a witness to commit a separate murder four months after this event; (2) that the uncorroborated testimony of accomplices is insufficient to sustain his conviction; and, similarly, (3) that the evidence presented is "insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty of first degree murder." In addition, Christopher Davis alleges (1) that the trial court committed prejudicial error by allowing testimony concerning gang activity and membership; (2) that the trial court's admission of testimony regarding Davis' aforementioned solicitation to commit murder four months after this crime occurred constituted prejudicial error; and, (3) that should this court deem these alleged errors harmless individually, the cumulative effect of such mistakes deprived him of due process by making the trial fundamentally unfair. Having reviewed all of these issues and finding that none provide a basis for relief to either defendant, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court if Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ, joined.

F. Michie Gibson, Jr., Nashville, Tennessee for appellant Gdongalay Parlo Berry; John E. Herbison, Nashville, Tennessee, for appellant, Christopher Davis.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Smith, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Tom Thurman, Assistant District Attorney, for appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

On October 17, 1995, the victim, Adrian Dickerson, and her mother, Regina Conley Hockett,[1] went to the Megamarket in the Hickory Hollow area shortly before 7:00 p.m. At trial Ms. Hockett recounted that while she was attempting to purchase airline tickets, the victim had asked for a quarter to use in a bubble gum machine. Explaining that she did not have change at the time but likely would after buying the tickets, Ms. Hockett asked the victim to wait. Thereafter the mother turned back to the counter and did not see her daughter leave the store.

After apparently obtaining a quarter from the family car, the victim was walking back toward the store when a bullet ripped through her neck. She died before emergency personnel could arrive.

Numerous people were present in front of the store or in its parking lot at the time of the shooting, and three were called by the State to testify at trial.[2] Donald Mapes, a part-time Megamarket employee on this date, was taking a break in front of the establishment when he heard a shot, prompting him to run inside the place of business. Mr. Mapes added that he saw a little girl hit the ground though did not notice anyone close to her. Jim Hammett also testified that he had been at Megamarket on the evening in question and that he and several others had exited the store at the same time. While facing the establishment and preparing to enter his car and leave, he heard a shot come from his left. Having seen the victim fall and, again, believing the shot to have come from his left, Mr. Hammett moved to the rear or passenger side of vehicle and crouched behind it for a brief period. He then jumped in his car, drove the short distance to his home, and called the police. Following Mr. Hammett's testimony, the State called Deborah Mitchell. This witness testified that she went to Megamarket to pick up her son, a store employee. While waiting for her son, she noticed "a sort of large" bluish-gray car with a couple of people in the front seat and possibly three or four in the back seat enter the lot. She stated that these individuals were black and that she had heard loud rap music coming from the car. Deciding to enter the store to see what was keeping her son, Ms. Mitchell got out of her automobile. Similarly to Mr. Hammett's vehicle, her car was parked in such a way that its passenger side was closest to the store. She then noticed a scratch/dent low on the automobile's back fender close to the trunk and bent to look more closely at the problem. As she was in the process of standing again, Ms. Mitchell heard a shot to her left,[3] which sounded as if it had been fired "just right behind" or beside her. By her own admission, she did not see the person who fired the shot, but did notice the bluish-gray car to her left afterward. She added that this vehicle subsequently slowly drove from the parking lot.

---

[1] At the time of trial, this witness had recently married and changed her last name from that provided on the witness list. For the purposes of this opinion, this Court will be using her married name of Hockett.

[2] All three also marked a diagram (which became an exhibit) reflecting some of the details of their testimony such as the locations of cars, where the victim's body had fallen, etc.

[3] From Ms. Mitchell's description, her left would have been the same as Mr. Hammett's.

Providing further information concerning what had transpired on October 17, 1995, were Antoine Kirby and Calvin Carter. Both identified the defendants at trial and stated that the defendant Davis had talked with them about involvement in a street gang known as the Folk or the Gangster Disciples. They further alleged that the defendant Davis invited them to ride in the backseat of the 1980's model gray[4] Cadillac[5] to the Megamarket on the night in question some time after Davis commented about putting the Gangster Disciples on the map.

Through his testimony, Antoine Kirby disclosed that in October of 1995, he had been a fourteen-year-old "Baby Gangster" or "B.G." and had occupied this role for two years selling drugs, counting money, etc. He affirmed that he "was not a true member of the gang", having not qualified for membership; however, in the courtroom he stated that both defendants were Gangster Disciples and distinguished the defendant Davis as the Nashville leader of this gang.

Detailing events leading up to the murder, Mr. Kirby testified that he went to the defendant Davis' apartment shortly after school on that date. While there, he observed the defendants enter a separate room where they remained for around five to ten minutes. Mr. Kirby stated that when the two emerged, the defendant Davis was holding a rifle that looked exactly like the weapon admitted as an exhibit in court, and Davis proclaimed, "I'm going to peel some white folks." Mr. Kirby interpreted "peel" to mean "murder" in this context and stated that thereafter the defendant had selected those to ride with him. Christopher Davis drove, G'dongalay Berry occupied the front passenger seat with the rifle, and the backseat held Jonathan Davis, Calvin Carter, and Antoine Kirby.

Mr. Kirby went on to state that they arrived in the Hickory Hollow area after riding for around forty-five minutes to an hour smoking marijuana blunts soaked in embalming fluid,[6] and listening to loud music. Once they arrived, they drove through a suburban neighborhood and ultimately came to and circled the Megamarket parking lot before stationing themselves toward the back and on the left side of this lot. The defendant Davis parked in a slanted manner with the passenger side of the car closest to the store.

Though acknowledging that the approximate three total hours of smoking the aforementioned marijuana on that evening had impacted his vision, Mr. Kirby related that he saw the defendant Davis then lean over toward the defendant Berry. While Mr. Kirby could not hear over the sound system, he next observed the defendant Davis' lips forming the words, "Go ahead and shoot. Go ahead and shoot." Continuing with this account, Mr. Kirby stated that he was unsure of how many shots had been fired, but he knew that the defendant Berry had aimed in the direction of the store.

---

[4] Jeffrey Todd, another witness and a mechanic who had performed work for the defendant Davis, confirmed that Davis had a 1985 or 1986 gray, four door Sedan DeVille in the fall of 1995 and that Davis had access to another gray Cadillac belonging to his mother.

[5] These witnesses did vary over the car's number of doors.

[6] Mr. Kirby testified that the drugs had been provided to those at the house and also admitted to drinking Red Irish Rose Wine while at the defendant Davis' residence that night.

This witness added that in that direction, he saw a Caucasian[7] lady putting something in or getting something from her trunk while standing approximately thirty to thirty-five feet from their car. According to Mr. Kirby, the defendant Davis then drove slowly from the lot.

Under direct examination this witness also claimed that the defendant Davis approached him about murdering someone around four months after this event. In exchange for committing this act, Davis reportedly promised to move up the witness' ranking in the gang to foot soldier.

Upon cross-examination Mr. Kirby attempted to explain parts of his behavior; admitted to previously having lied; denied recalling information responsive to numerous questions asked by the defense attorneys; and re-affirmed many of his statements. For example, he testified that he had not been focusing or thinking well when he got into the car that night, but did not believe that anyone was going to be killed: he thought that they would ride around, continue getting high, and maybe go to the movies. Furthermore, he remarked that some of the seeming inconsistencies in his account stemmed from his confusion with respect to the manner in which various questions were asked. However, he did acknowledge that he had lied when first questioned by the police. He also said that one of the investigating detectives had told him that "if I didn't do what I had to do to tell the truth that he would throw a case or something like accessory or something" at him. Nevertheless, the witness then indicated that he had not wanted to go to jail for something that he had not done; thus, he subsequently told the truth. Moreover, while Mr. Kirby agreed that he had forgotten until later Davis' comment about killing white people, he was quite clear that neither the prosecution nor the detectives had suggested the latter to him. Mr. Kirby stated that he simply did not remember immediately all of the details of an event that had happened years ago, but had recalled additional information as he had spent time thinking about that night. In addition, among numerous matters that he denied remembering, this witness claimed that he could not recall talking to a private investigator for the defense and telling this individual that he did not think Berry had anything to do with this shooting. Finally, he re-asserted some of the key factors brought out on direct examination concerning this event, such as the comment about going to peel white people; his having read the defendant Davis' lips; the defendant Berry's having fired in the direction of the Megamarket; and the Caucasian (light-skinned) lady's presence around thirty to thirty five feet from their car in the direction of the store.

Calvin Carter took the stand after Mr. Kirby. On October 17, 1995, Mr. Carter a juvenile[8] went to Mr. Kirby's home after school in search of Mr. Kirby's oldest brother. While Mr. Carter did not find Mr. Kirby's brother, the witness did encounter Davis next door at Davis' grandmother's home. According to the witness, Davis began talking to him about the Gangster Disciples. In the process the defendant Davis indicated that the gang was making money; that he wanted Mr. Carter to join and sell drugs; and that Mr. Carter would not only make money, but also live longer if he joined. Having at some point traveled from the home of Davis' grandmother to Davis' duplex, Mr. Carter was invited by Davis to go with him, Berry, Jonathan Davis, and Mr. Kirby in the car.

---

[7] While testifying on cross-examination that the individual to whom he referred here may have been a light-skinned black woman or a woman of some other race, he stated that she was not "dark" and that he had seen two or three Caucasians in the lot at that time.

[8] Mr. Carter was sixteen years of age at the time of the offense.

According to this witness, Davis asked Berry to ride in the front passenger seat, and when Mr. Carter came to the car, Berry had been carrying a weapon that looked like the one marked as an exhibit at trial. Mr. Carter also testified that once in the car, the group smoked marijuana and drove around for approximately forty minutes before arriving at the Megamarket. At that point Davis turned down the music and announced "we're fixing to do something. Let's skin some white folks;" parked the car on the left side of the lot with the passenger side closest to the store; nodded at the defendant Berry; grabbed the rifle and pointed it out of the window. Mr. Carter also observed Davis say something to Berry around this time. Thereafter, Mr. Carter slid down in the seat, but saw Berry apparently aim the weapon toward the Megamarket and heard the fire. This witness stated that the defendant Davis then drove slowly out of the parking lot, sped away from the scene, and turned the music up loud again. Because he had eased down in the back seat, Mr. Carter saw little else and initially denied knowing that anyone had been killed.

Also during his testimony this witness acknowledged that when the police first approached him regarding this matter, he was in jail for an altercation with his girlfriend, wherein he had told her that he and his friends had killed the victim and that he could have her killed also. And, while he admitted that he would have been in trouble if he told the authorities that he had knowingly taken part in a murder, this witness stated that he had not thought that anyone was going to be shot on that night. Furthermore, Mr. Carter admitted that he had lied to protect himself in his initial meeting with the police as he had told them that he was at the scene in a separate car from the defendants. Still, Mr. Carter contended that when later approached, he told and continued to tell the truth to the best of his ability.

Detective Roland of the Metro Murder Squad Unit testified that the defendant Davis acknowledged his involvement in the Gangster Disciples and drew gang symbols for Roland. In addition, this witness interviewed Berry, who likewise admitted his affiliation with the Gangster Disciples. According to the detective, Berry also talked about the procedure for being admitted into a gang: he told Detective Roland that one of the means by which an individual could become a member was to kill.[9]

Two other Metro detectives, Pat Postiglione and Al Gray, also testified concerning their encounter with these defendants. On February 28, 1996, the detectives went to the duplex rented by Davis and Ronald Benedict. They were invited inside and were speaking with Mr. Benedict and another individual when both defendants[10] and a female arrived. Seeing the officers, these three began to run, and the officers gave chase. In the process, Berry dropped or threw the Chinese SKS assault rifle[11] with which he had entered. Detective Postiglione secured the weapon which was later given to Identification Technician Earl Hunter. At the time of confiscation, the weapon was loaded with approximately thirty rounds of ammunition, and a subsequent search of Davis' room resulted in the seizure of roughly ninety additional rounds of the same type.

---

[9] Others included being "beaten in" or committing a series of crimes such as rapes, robberies, etc. In addition, the defendant apparently related to the detective a parable about birds that suggested that gangs frowned upon killing civilians.

[10] Detectives Postiglione and Gray also identified the defendants at trial.

[11] This rifle is the weapon that was made an exhibit at trial and identified by numerous parties.

Detective Gray later took this ammunition and weapon to the Tennessee Bureau of Investigation (TBI) lab for testing along with a fragment removed from the victim during the autopsy. There Special Agent Steve Scott examined these items and testified concerning his findings as a firearms analysis and comparison expert. This witness essentially began detailing his analysis by stating that weapons leave a "mechanical fingerprint" on shell casings and bullets used therein. However, he stated that the jacket fragment taken from the victim in this case represented only a small portion near the nose of the bullet. Because it came from this tapered area, the fragment would not have come into contact with the barrel and, therefore, bore no signature markings from a barrel, which could have enabled him to match the fragment to a particular weapon. Yet, he was able to give his opinion that the fragment was consistent with some of the ammunition seized at Davis'[12] residence and was of the type normally fired by the weapon alleged to have been used to kill the victim.

The medical examiner, Detective Gray, and Thomas Haines all identified the entrance and exit wounds, indicating a left to right path of the bullet. Based on his education and experience as a Special Forces Medic and then as a paramedic/EMT for a total of over fourteen years; having received special training in ballistic wounds; and having personally observed around 500 gunshot wounds, Mr. Haines testified that young Ms. Dickerson had "more than likely [been] dead before she hit the ground." Furthermore, he described the size of her wounds and the internal injuries to her neck before stating his belief that a high caliber, high powered rifle was responsible for her wound.

The defendants offered little additional evidence. Berry called only Patrick Welles. This individual stated that he was a private investigator who had attempted to telephone Mr. Kirby about this case. Because no one answered, he left a number at which he could be reached and subsequently received a call from the same number at which he had left the message: he believed the individual on the other line was Mr. Kirby. According to Welles, the caller stated that he did not believe that the defendant Berry had been involved in the victim's murder. Thereafter, Davis offered a stipulation concerning the observations of two unavailable witnesses. Had she been present at trial, Sandra Haines allegedly would have stated that she saw a five-foot-ten black male crouching between cars in the Megamarket parking lot at the time of the murder: this man then entered a two door gray or silver car, possibly a Chevrolet Cavalier. Additionally, the stipulation provided that Laura Hickman would have said that she saw a five-foot-ten to five-foot-eleven, twenty-year-old black male wearing shoes, light colored pants, and a dark sweatshirt at the scene of the crime. Additionally, she allegedly would have also testified that this individual had left in a red car.

After hearing this and other proof, the jury convicted both defendants of first degree murder for which each received a life sentence. As noted above, they now bring before this court a total of six alleged grounds for relief from their convictions.

---

[12] It remains unclear whether the better match came from ammunition actually in the weapon at the time of confiscation or in the defendant Davis' room because these sets were commingled at the scene. Though all was 7.62 caliber and typical of use in a Chinese SKS assault rifle, some of the ammunition was of Chinese make while some was Russian. However, circumstances and Agent Scott's detailed comparisons suggest that the weapon thrown by the defendant Berry had been loaded with the Russian variety, and the firing of this make in this rifle resulted in the tip of the test bullet being remarkably consistent in shape to the fragment recovered from the victim.

# DENIAL OF SEVERANCE

First, the defendant Berry contends that his trial should have been severed because the trial court allowed a witness (Mr. Kirby) to testify concerning his co-defendant's purported solicitation of the witness to commit a murder four months after this victim's death. When examining this type of allegation, we first note that Rule 14(c)(2)(ii) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall grant a severance of defendants . . . during trial . . . [if] it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(ii). Then turning to case law, it becomes clear that the decision concerning "[w]hether to grant a severance is within the trial judge's sound discretion." State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996). "The exercise of that discretion will not be reversed absent an affirmative showing of prejudice." Id. "In other words, the record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty.'" Parham v. State, 885 S.W.2d 375, 383 (Tenn. Crim. App. 1994) (quoting Hunter v. State, 440 S.W.2d 1, 6 (Tenn. 1969)). The trial court, however, must not only protect the rights of the accused; it must also safeguard the rights of the State/prosecution, "and when several persons are charged jointly with a single crime, . . . the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants." State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982) (quoting Woodruff v. State, 51 S.W.2d 843, 845 (Tenn. 1932)).

Looking to the particulars of this case, clear prejudice mandating a severance is not present. In making this decision, we have considered State v. Ogle, 666 S.W.2d 58 (Tenn. 1984), deemed by the defendant to be analogous to his situation. However, we conclude that the facts of Ogle and those in this case are distinguishable from one another. In Ogle the statement at issue unquestionably violated Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), because the non-testifying co-defendant's comments admitted at trial "clearly inculpated" the defendant in the offense being tried. See Ogle, 666 S.W.2d at 60-61. But, in the case presently before this court, the solicitation involved the defendant Davis and made no reference to Berry. Furthermore, prior to the admission of the contested statement, Detective Roland testified concerning his conversation with Berry about how an individual became a member of a gang. As noted in the above recitation of the facts, Berry himself allegedly told the detective that killing someone was one of the means by which a person could gain admittance into the gang.[13] Therefore, the jury was already aware that both Davis and Berry were members of a gang that accepted murder as one of its precepts. The situation presented by this case simply does not rise to the level of a "substantial threat" to the rights of the accused as contemplated by Bruton, 391 U.S. at 137.

In addition, we observe that not only did the contested statement make no mention of Berry, but the trial court took an affirmative step to adequately protect him. To this end, the trial court instructed the jury at the close of the proof to "give separate consideration to each defendant" and that "[a]ny evidence which was limited to a particular defendant should not be considered by you

---

[13] Through cross-examination of this witness, the defense did not contest the idea that killing is one of the means of becoming a gang member. Also on cross-examination, Detective Roland readily acknowledged that Berry did not claim to have killed anyone in order to become a Gangster Disciple.

as to any other defendant." The law presumes that juries follow the instructions they receive absent clear and convincing proof to the contrary. See, e.g., State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). No such proof is cited by the defense, nor do we find any such proof. For this reason and those set out above, we find the defendant Berry's first issue to be without merit.


## SUFFICIENCY

The defendant Berry also challenges the sufficiency of the evidence supporting his conviction. In doing so, he essentially brings a two-pronged attack. One of these contentions involves the assertion that the evidence presented at trial was insufficient as a matter of law to sustain the jury's verdict because the State failed to prove premeditation. He also contends that his conviction rests on the uncorroborated testimony of two accomplices and, therefore, should be reversed. As these issues are somewhat interrelated, we shall consider them jointly.

### A.

When an appellant challenges the sufficiency of the evidence, this court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty, rendered by a jury and approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State the strongest legitimate view of the evidence, as well as all reasonable and legitimate inferences that may be drawn therefrom. See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence in evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

Before examining the alleged lack of proof of premeditation, we note that the language of Tennessee Code Annotated Section 39-13-202(a)(1) defines first degree murder as the "premeditated and intentional killing of another." Furthermore, Tennessee Code Annotated § 39-13-202(d) states:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered

-8-

in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

The existence of this element remains a question for the jurors to determine and may be established by proof of the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Factors that tend to establish the existence of premeditation include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). In addition, State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995), provides that a jury faced with resolving this question also may utilize facts raising the inference of a motive and/or the implementation of a preconceived design.

Turning from the applicable case law to an examination of the proof before us viewed in the light most favorable to the State, the record supports the finding that the defendant's conduct fulfilled all of the elements of this crime, including that of premeditation. According to the evidence, the defendant Berry entered a room with the defendant Davis on the evening of the murder. The latter emerged therefrom minutes later proclaiming, "I'm going to peel some white folks." Shortly afterward, Davis commented about "put[ting] the Gangster Disciples on the map" prior to getting into a 1980's model gray Cadillac. Berry, a fellow Gangster Disciple, took his place in the passenger seat of this car driven by Davis and carried a rifle into the vehicle. He sat in the front seat with this rifle until they arrived at the Megamarket in the Hickory Hollow area around forty-five minutes later. Davis entered the lot and drove toward the back of the lot where he parked across a couple of spaces; said "Let's skin some white folks;" and then instructed Berry to shoot. At that time, Berry pointed the aforementioned weapon out of the car window in the direction of the store, aimed the rifle, and fired. Several individuals were in the parking lot, including Deborah Mitchell, who appeared to be Caucasian. Again, resolving all conflicts in the light most favorable to the State, the jury reasonably could have concluded from the testimony presented that Ms. Mitchell was the intended target. Though Ms. Mitchell was not struck, the shot tore through the victim, Adrian Dickerson, ending her life. Subsequent analysis of the jacket fragment recovered from the victim revealed that this fragment was consistent with the type of ammunition that would be used in the assault rifle discarded by Berry during a chase by the police months later. Furthermore, both Mr. Kirby and Mr. Carter, potential Gangster Disciple recruits who had been chosen to ride in the backseat of the Cadillac during the shooting, testified that this weapon appeared to be the one they had seen Berry using on the night in question.

From this evidence a rational trier of fact could reasonably have found Berry guilty of first degree murder. First, Berry procured a weapon. Second, he subsequently used this weapon against an unarmed victim. Third, he did so attempting to carry out a preconceived design of murdering a

Caucasian.[14] And fourth, he was motivated by a desire to enhance his standing in the gang. This issue lacks merit.

**B.**

Moving to the allegation concerning the lack of sufficient corroboration of "accomplice" testimony, the law of this state defines an accomplice "as a person who knowingly, voluntarily, and with common intent unites with the principle offender in the commission of a crime." State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). When the facts concerning a witness' behavior clearly and undisputedly conform to this definition, the trial court must declare the witness an accomplice as a matter of law. See id. However, "when the facts as to the witness' complicity are disputed and susceptible of different inferences, [this determination] is a question of fact for the jury." Conner v. State, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975).

In this case the State charged neither Mr. Kirby nor Mr. Carter in connection with this offense. Additionally, both witnesses testified that they did not believe a murder would take place on their ride with the defendants. Our review of the record reveals no proof that these individuals verbally encouraged or planned the murder, provided the weapon for committing the offense, etc. Nevertheless, some proof arguably existed in support of the conclusion that they were accomplices to the crime. As such, the trial judge instructed the jury on the definition of an accomplice, the need for corroboration of it, and how such testimony should be considered.

We note again that juries are presumed to follow the instructions that they receive absent proof to the contrary. See Vanzant, 659 S.W.2d at 819. Yet, because juries make no finding on the record about whether they deem an individual to be an accomplice, we will review this issue as if the jury concluded that Mr. Kirby and Mr. Carter were accomplices.

Our analysis begins with the well-settled premise that convictions may not be based solely upon the uncorroborated testimony of accomplices. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. See State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, the rule of accomplice corroboration is as follows:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

State v. Griffis, 964 S.W.2d 577, 588-589 (Tenn. Crim. App. 1997) (quoting Sherrill v. State, 321

---

[14] The law clearly provides that the defendant Berry's level of culpability is not reduced because of the likelihood that he was a poor shot, missing an intended Caucasian murder victim and instead killing a twelve-year-old African-American girl. See Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999).

S.W.2d 811, 814 (Tenn. 1959)).

In addition,

> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

Griffis, 964 S.W.2d at 589; see also, Bigbee, 885 S.W.2d at 803.

We further note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. See id.; State v. Maddox, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997).

Assuming arguendo that Kirby and Carter were accomplices, we conclude that their testimony was sufficiently corroborated. Resolving all conflicts in favor of the State, both Jim Hammett's and Deborah Mitchell's accounts indicated that the shot had been fired from behind and to the left of them in the Megamarket parking lot. This description coincides with that provided by the alleged accomplices. Furthermore, Ms. Mitchell's description of her placement on the lot and bending to look at a scratch toward the rear of her car is in keeping with the behavior of the Caucasian woman to whom Mr. Kirby referred. In addition, Davis' mechanic, Jeffrey Todd, stated that Davis owned or had access to two gray Cadillacs around the time of the murder. Ms. Mitchell related that shortly before and after the shooting she saw a bluish-gray Cadillac with two people in the front and possibly three in the back. She added that all of these individuals were black and that rap music was emanating from the car. These factors are consistent with Mr. Kirby's and Mr. Carter's accounts. More specifically tying Berry to the crime, we note that Detective Roland testified that Berry had acknowledged being a Gangster Disciple–as had Davis. Months later when Berry and Davis entered Davis' home together, both fled upon seeing police officers in the home. While fleeing, Berry threw down a Chinese SKS assault rifle that he had been carrying when he entered. According to Special Agent Scott of the TBI Crime Lab, the bullet fragment removed from the victim was consistent with the type of ammunition typically utilized in this weapon. Furthermore, using a water tank intended for testing, Agent Scott fired both types of ammunition recovered from the scene and then compared the resulting fragments with the one removed from the victim. He found the comparative appearance of the kind of ammunition most likely in the weapon at the time the rifle was discarded[15] and the fragment taken from Adrian

---

[15] As noted previously, the police inadvertently co-mingled the ammunition removed from the weapon and the ammunition recovered from the defendant Davis' home. However, prior to unloading the rifle, the weapon had accidentally discharged. This resulting shell casing matched the type of ammunition which the agent found physically remarkable in comparison to the fragment taken from the victim. In addition, the assault rifle had been modified to hold

(continued...)

Dickerson "quite remarkable". Such proof tends to connect Berry with the commission of the crime; therefore, this issue also is without merit.

## ADMISSION OF "GANG" TESTIMONY

Turning to the issues asserted by the defendant Davis, he first contends that the trial court erroneously admitted evidence concerning his gang participation. Among the alleged supporting authorities for this claim, the defendant cites State v. Curtis D. Haywood, No. 02C01-9707-CR-00289, 1998 WL 855436, at *5 (Tenn. Crim. App. at Jackson, Dec. 11, 1998), which provides that "[t]estimony or other evidence of a defendant's affiliation with a street gang has been admitted into evidence in Tennessee if the evidence meets the standards in [Tennessee] Rules [of Evidence] 401, 403, and 404."[16]

In keeping with these guidelines, we observe that admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401. This rule defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. And finally, Rule 404 deals with alleged "character evidence." Subsection (b) of this rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, the same subsection further sets out that such evidence may be allowed "for other purposes" if the following conditions are met prior to admission of this type of proof:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

---

[15](...continued)
a thirty-six round magazine. Of the co-mingled 7.62 ammunition, 30 were the type matching the shell casing and producing the fragment strikingly similar to the fragment recovered from Miss Dickerson while 96 were of the other make.

[16] Though cited by the defense, Haywood clearly indicates that this state does not exclude all testimony concerning gangs. (Such is evident from the above quotation.) Thus, while the Haywood Court ruled the admission of the gang testimony before it error, it specifically explained that [n]othing in the circumstances of the crime indicates that the defendant's aborted robbery was related to any gang activities or that he committed the crime to gain membership or status in the gang." Haywood, 1998 WL 855436, at *6. The court went on to state that the defendant's "membership in the Gangster Disciples was not relevant to show identity, intent, motive, or common scheme or plan or to sustain the state's burden of proving each element of the crimes beyond a reasonable doubt." Id. (citations omitted). In contrast, evidence of gang membership does serve such a valid purpose as noted in the analysis of this issue.

Tenn. R. Evid. 404(b).  Providing further clarification concerning the second requirement, both the Advisory Commission Comment to this rule and case law state that the above-mentioned "other purposes" include issues such as motive, intent, etc.  See e.g., State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985); Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980); State v. Jones, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999).  Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent a showing that it abused its discretion in doing so.  State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

As we look to the lower court's handling of the matter before us, we find substantial compliance with the above-delineated procedure.  First we note that the defense originally raised this concern through a motion in limine.  Outside of the jury's presence, the court heard from both the defense and the State.  In making its argument, the State contended that the defendants were motivated by a desire to enhance the membership and/or prestige of the Gangster Disciples by intentionally killing a white person. After taking this issue under consideration, the trial court concluded that the contested evidence was relevant to motive and intent.  The trial judge further found that the prejudicial effect of this proof did not outweigh its probative value.  Based upon our review of the record and as reflected in the facts set out in this opinion, we agree and, therefore, find no abuse of discretion. Though motive is not an element of first degree murder, this factor was highly relevant and material to the State's effort to prove that an otherwise senseless killing was the product of a premeditated and deliberate act on the part of the defendants and was done as gang activity. The trial court properly admitted this testimony under Tennessee Rule of Evidence 404(b).

In addition, once again the trial court gave a limiting instruction to the jurors concerning the manner in which they were to treat this evidence.  As previously stated, a reviewing court must presume that the jury did as instructed absent proof to the contrary.  See Vanzant, 659 S.W.2d at 819. The record presents no such proof.  This issue lacks merit.


### SUBSEQUENT SOLICITATION TO MURDER TESTIMONY


In his next issue the defendant Davis asserts that the trial court erred in allowing Mr. Kirby to testify that Davis  "solicited him to commit a subsequent murder."  For support Davis leans on two theories. First he alleges that the requisite clear and convincing evidence that this subsequent crime was committed and that he committed it could only have been met by a jury-out direct and cross-examination of Mr. Kirby.  Furthermore, he avers that the danger of unfair prejudice outweighed any probative value that this testimony might offer.

Davis does not cite authority for his conclusion that a full-examination of Mr. Kirby on this point is legally required.  Moreover, Davis made no request at trial for such an examination of Kirby. That part of this issue is therefore waived.  See, Ct. Crim. App. R. 10(b).[17]  However, we will briefly address the question of whether the probity of this other evidence outweighs the danger of unfair prejudice.  See Tenn. R. Evid. 404(b).

---

[17]Davis's trial attorney objected to the admission of this testimony, but not on the basis that the incident had not occurred.   Nor did counsel request any voir dire of Mr. Kirby prior to Mr. Kirby's testifying before the jury.

The trial judge did not conduct a full 404(b) hearing with respect to Davis' subsequent solicitation of Kirby to commit murder. Instead, the trial judge alluded to his previous rulings on other gang related evidence, discussed supra., that such evidence was probative of motive and intent and that its probity outweighed its potential for unfair prejudice. However, the risk of potential unfair prejudice from evidence of an actual solicitation to commit an unrelated murder is far greater than general testimony about gang affiliation and the violent nature of the gang. This risk here is that a jury might conclude that if Davis solicited one murder, he has a propensity to put others up to committing murder. This is the very type of propensity evidence prohibited by Tenn. R. Evid. 404(b). Nevertheless, we are convinced that any error in admitting this testimony was harmless. The jury was already aware that the Gangster Disciples counted murder and other violent crimes as basic tenets of gang membership. The panel was also aware that Davis was a gang leader. Under the circumstances, it is highly unlikely that any juror was shocked or swayed any further based on proof of Davis' actual solicitation of Kirby to participate in a gang rite of passage. We find any error in admitting this proof did not more probably than not affect the verdict in this case, and no reversal is required as a result. See Tenn. R. App. P. 36(b).

## CUMULATIVE ERROR

Through his final assertion, the defendant Davis avers that this court should not consider in isolation errors that we deem harmless. He further argues that the cumulative effect of such errors could and did result in the violation of his right to due process. However, because we do not find multiple errors to be combined for consideration, this issue lacks merit.

## CONCLUSION

For the foregoing reasons, we find that none of the issues raised merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE